# In re H-, Applicant

*Decided May 30, 1996*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1) Membership in a clan can constitute membership in a "particular social group" within the meaning of section 208(a) of the Immigration & Nationality Act, 8 U.S.C. § 1158(a)(1994); the Marehan subclan of Somalia, the members of which share ties of kinship and linguistic commonalities, is such a "particular social group."

(2) While interclan violence may arise during the course of civil strife, such circumstances do not preclude the possibility that harm inflicted during the course of such strife may constitute persecution within the meaning of section 208(a) of the Act; and, persecution may occur irrespective of whether or not a national government exists.

(3) An alien who has demonstrated past persecution is presumed to have a well-founded fear of future persecution unless it is demonstrated by a preponderance of the evidence that, since the time the persecution occurred, conditions in the applicant's country have changed to such an extent that the applicant no longer has a well-founded fear of persecution in that country.

(4) In the consideration of whether a favorable exercise of discretion should be afforded an applicant who has established eligibility for asylum on the basis of past persecution, careful attention should be given to compelling, humanitarian considerations that would be involved if the refugee were to be forced to return to a country where he or she was persecuted in the past.

FOR APPLICANT: Joyce Antila Phipps, Esquire, Newark, New Jersey

FOR THE IMMIGRATION AND NATURALIZATION SERVICE: Charles Parker, Jr., District Counsel

BEFORE: Board En Banc: SCHMIDT, Chairman; DUNNE, Vice Chairman; VACCA, HOLMES, HURWITZ, VILLAGELIU, FILPPU, COLE, ROSENBERG, MATHON, and GUENDELSBERGER, Board Members. Dissenting Opinion: HEILMAN, Board Member.

ROSENBERG, Board Member:

In a decision dated December 19, 1994, an Immigration Judge found the applicant to be excludable as alleged, denied his applications for relief, and ordered him excluded and deported from the United States to Somalia. The applicant, who sought asylum on the basis of persecution that he suffered as a member of a particular social group in Somalia, the Marehan subclan, appealed. For the reasons discussed herein, we sustain the applicant's appeal

in part, with respect to his claim that he has established past persecution, and remand for further proceedings to determine whether discretionary asylum or withholding of deportation shall be granted.

## I. DECISION OF THE IMMIGRATION JUDGE

The decision of the Immigration Judge denying the applicant's request for relief rested on the conclusion that "there is no evidence there is a government in Somalia. A person is not entitled to political asylum in the United States because of clan warfare or because of civil warfare." The Immigration Judge opined that an individual is not entitled to asylum because he was beaten by members of a party to a conflict, or incarcerated by such group for a period of 5 days. The Immigration Judge also found that the applicant had safe haven in Kenya, the country to which he initially fled, where he ultimately lived in a refugee camp for over 2 years. The Immigration Judge made no specific finding as to the applicant's credibility.

This Board makes a de novo review of the record with respect to the claim presented by the applicant, and, based on that review, makes its own independent findings. *Matter of Burbano*, 20 I&N Dec. 872 (BIA 1994). We find that the Immigration Judge erred as a matter of law in dismissing the factual and political context in which the claim arose, and in failing to give appropriate consideration to the claim of persecution on account of membership in a particular social group made by the applicant.

## II. ISSUE BEFORE THE BOARD

Based upon our de novo review of the record, we conclude that the applicant has established that he suffered past persecution in Somalia on account of his membership in a particular social group. However, that is not the end of the inquiry. Remaining for determination is whether a grant of asylum is warranted and/or whether withholding of deportation is required. In light of our finding of past persecution in this case and because we are not satisfied that the record was sufficiently developed, we will remand to the Immigration Judge for further proceedings. Further, because this Board has not previously fully addressed the current law and procedure governing the assessment of past persecution claims, we now take this opportunity to do so.

## III. LAW GOVERNING THE APPLICANT'S CLAIM OF PAST PERSECUTION

In the adjudication of an application for asylum or withholding of deportation, the first issue to be resolved is whether the applicant qualifies as a refugee. An applicant may so qualify based upon past persecution, a well-founded fear of persecution, or a clear probability of persecution, on account of a ground provided for by the Act. We limit our discussion here,

given the facts of the case before us, to the adjudication of cases involving claims of past persecution.

An applicant is eligible for asylum under section 208(a) of the Immigration and Nationality Act, 8 U.S.C. § 1158(a) (1994), if he or she can meet the burden of showing that he or she is a refugee within the meaning of section 101(a)(42)(A) of the Act, 8 U.S.C. § 1101(a)(42)(A) (1994). That section provides in relevant part:

> The term "refugee" means (A) any person who is outside any country of such person's nationality . . . and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . .

Section 101(a)(42)(A) of the Act; *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 441 (1987).[1]

That past persecution can be the basis for a successful asylum claim is clear from the language of the statute. Section 208 of the Act provides that an alien may be granted asylum if he is found to be a "refugee" within the meaning of section 101(a)(42)(A) of the Act "*because of persecution*." (Emphasis added.)

Both this Board and the federal courts have recognized past persecution as a basis for granting asylum. *See Matter of D-V-,* 21 I&N Dec. 77 (BIA 1995) (recognizing as persecution grievous harm suffered in Haiti in direct retaliation for activities on behalf of Aristide); *Matter of B-*, 21 I&N Dec. 66 (BIA 1995) (recognizing that the 1988 arrest of a Mujahidin supporter in Afghanistan, and his subsequent interrogation and severe physical abuse constituted persecution); *Matter of Chen*, 20 I&N Dec. 16 (BIA 1989) (recognizing that the severe repression of the applicant during China's "Cultural Revolution" constituted persecution); *see also, e.g., Acewicz v. INS*, 984 F.2d 1056, 1061-62 (9th Cir. 1993); *Ravindran v. INS*, 976 F.2d 754 (1st Cir. 1992); *Desir v. Ilchert*, 840 F.2d 723 (9th Cir. 1988); *Blanco-Comarribas v. INS*, 830 F.2d 1039 (9th Cir. 1987); *cf. INS v. Cardoza-Fonseca, supra.* Moreover, as we pointed out in *Matter of Chen, supra,* the Operations Instructions of the Immigration and Naturalization Service and the Service Worldwide

---

[1] An alien who seeks asylum in the United States on the basis of a well-founded fear of persecution must establish that (1) he or she has a fear of persecution in the country of his or her nationality or last habitual residence on account of one or more of the aforenoted grounds, to wit, race, religion, nationality, membership in a particular social group, or political opinion; (2) there is a reasonable possibility of actually suffering such persecution if he or she were to return there; and (3) he or she is unable or unwilling to return to or avail himself or herself of the protection of the authorities of the relevant country because of such fear. 8 C.F.R. § 208.13(b)(2) (1995). One who seeks to be granted withholding of deportation under section 243(h) of the Act, 8 U.S.C. § 1153(h) (1994), must demonstrate a clear probability of persecution, to wit, that his or her life or freedom would be threatened in the proposed country of deportation on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.16(b) (1995).

Guidelines for Overseas Refugee Processing ("Guidelines") acknowledge that past persecution and a well-founded fear of future persecution are alternative methods of establishing refugee status.

In order for an applicant to meet his or her burden of establishing past persecution, the applicant's credible testimony, if plausible in light of general conditions in his or her country of nationality or last habitual residence, may be sufficient to sustain the burden of proof without corroboration. *Matter of Mogharrabi,* 19 I&N Dec. 439 (BIA 1987); *see also Matter of Dass,* 20 I&N Dec. 120 (BIA 1989); 8 C.F.R. § 208.13(a) (1995). An applicant's request for asylum will be granted if he or she proves eligibility for asylum, there are no mandatory reasons for denying asylum,[2] and, relief is warranted in the exercise of discretion. *See* section 208(a) of the Act; 8 C.F.R. §§ 208.13, 208.14 (1995).

## IV. EVIDENCE OF PERSECUTION SUFFERED BY THE APPLICANT

The applicant is a native of Somalia and an undisputed member of the Darood clan and the Marehan subclan, an entity which is identifiable by kinship ties and vocal inflection or accent. For 21 years Somalia had been ruled by Mohammed Siad Barre, a member of the Marehan subclan, which constitutes less than 1 percent of the population of Somalia. In December of 1990, an uprising was instituted by members of the other clans, which ultimately caused Mohammed Siad Barre to relinquish his power and to flee the capital city of Mogadishu on January 21, 1991.

As a result of favoritism that had been shown to members of the Marehan subclan during the course of Mohammed Siad Barre's often brutal regime, the clans which rebelled against his rule sought to retaliate against those who had benefited from the regime. The applicant's father, a businessman who had greatly benefitted from his membership in the Marehan subclan, was murdered at his place of business in Mogadishu on January 12, 1991, by members of the opposition United Somali Congress, composed mostly of members of the Hawiye clan. The applicant's family home, located in the Marehan section of the city, was targeted 2 days later by the same group. During the course of that attack, the applicant's brother was shot. He was later murdered at the hospital to which he had been brought for the treatment of his injury.

---

[2] An applicant is not eligible to receive asylum in the United States if he or she ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion. 8 C.F.R. § 208.13(c). Moreover, asylum is to be denied in the following circumstances: if the alien, having been convicted of a particularly serious crime, constitutes a danger to the community; if there are reasonable grounds for regarding the alien as a danger to the security of the United States; if the alien has been convicted of an aggravated felony; or, if the alien has been firmly resettled. 8 C.F.R. § 208.14(d) (1995).

On January 13, 1991, 1 day after the attack on the applicant's home, he fled Mogadishu with his step-mother and younger siblings to a smaller town, Kismayu, which was a stronghold of the Darood clan. Approximately 1 month later, that town was attacked by the United Somali Congress. As a result, the applicant, who was not with his family at the time, was rounded up and detained without charges along with many other Darood clan members. During the course of his 5-day detention, the applicant was badly beaten on his head, back, and forearm with a rifle butt and a bayonet, resulting in scars to his body which remain to the present. A maternal uncle of the applicant, who was a member of the United Somali Congress, recognized him and assisted in his escape, driving him approximately 40 kilometers in the direction of Kenya. The applicant traveled the rest of the way to Kenya, approximately 90 kilometers, by foot. He reunited with his family in the town of Leboi, Kenya, where they remained until April 1992, when they were transferred to a refugee camp elsewhere in Kenya. The applicant lived in that camp until August of 1994 when he was able to procure funds through a relative in Saudi Arabia which allowed him to travel to the United States.

The facts claimed by the applicant in support of his application for relief were presented consistently by him in his Request for Asylum in the United States (Form I-589), in a declaration submitted in support thereof, and in his testimony before the Immigration Judge. These facts establish a plausible account of persecution.[3] The applicant has not submitted documentary evidence to support events personal to him which provide the basis for his claim, to wit, the murder of his father and brother, his own detention and torture, and the fact that these events caused him to flee, with his remaining family members, to neighboring Kenya and eventually a refugee camp in that country. However, in corroboration of his testimony, he has provided substantial evidence of the general conditions in his country of nationality and of the situation of Somali refugees in Kenya. *See Matter of Dass, supra,* at 124 (BIA 1989) (holding that while testimony alone may suffice, documentation is not optional and corroborative background evidence that establishes a plausible context for the persecution claim (or an explanation for the absence of such evidence) may well be essential); *Matter of Mogharrabi, supra.*

On the basis of the evidence, we conclude that he has presented a credible account of his Marehan background, of the circumstances that befell him in Somalia, and of his flight from that country. Thus, the determination of whether or not the applicant is a refugee and the ultimate disposition of his eligibility for asylum are contingent upon this Board's findings as to whether the clan of which he is a member constitutes a "particular social group"

---

[3] While there appears to have been some initial confusion concerning the applicant's date of departure from Somalia, the record reflects that the applicant's English language ability is limited; the proceedings in this matter were conducted in the Somali language. Consequently, we will accord no significant weight to the interview statement given by the applicant upon his arrival in the United States, as it was conducted by the Service in the English language.

within the meaning of the Act, and whether he was persecuted "on account" of his membership in that particular social group.

### A. Family Membership in the Marehan Subclan Constitutes a Social Group

This Board has interpreted the phrase "persecution on account of membership in a particular social group" to mean persecution that is directed toward an individual who is a member of a group of persons all of whom share a common, immutable characteristic.

*Matter of Acosta*, 19 I&N Dec. 211 (BIA 1985); *Matter of Mogharrabi, supra.* In *Matter of Acosta, supra,* at 233-34, we set forth the following to develop what may constitute a "particular social group":

> The shared characteristic might be an innate one such as sex, color, or kinship ties, or in some circumstances it might be a shared past experience such as former military leadership or land ownership. The particular kind of group characteristic that will qualify under this construction remains to be determined on a case-by-case basis. However, whatever the common characteristic that defines the group, it must be one that the members of the group either cannot change, or should not be required to change because it is fundamental to their individual identities or consciences. Only when this is the case does the mere fact of group membership become something comparable to the other four grounds of persecution under the Act, namely, something that either is beyond the power of an individual to change or that is so fundamental to his identity or conscience that it ought not be required to be changed.

By construing "persecution on account of membership in a particular social group" in this manner, we preserve the concept that refugee status is restricted to individuals who possess a characteristic so fundamental to their identities or conscience that they are either unable to change by their own actions or that they should not be required to change in order to avoid persecution. *Id.; accord Fatin v. INS*, 12 F.3d 1233, 1240 (3d Cir. 1993).

The Immigration and Naturalization Service *Basic Law Manual* on asylum adjudications cites a December 9, 1993, legal opinion of the Office of the INS General Counsel, Op. Off. Gen. Counsel (1993) [hereinafter Legal Opinion], in support of the conclusion that a Somali clan may constitute a "particular social group." *See* INS, U.S. Department of Justice, *Basic Law Manual, U.S. Law and INS Refugee Asylum Adjudications* 48 *in* 8 Charles Gordon et al., *Immigration Law and Procedure* (Matthew Bender rev. ed. 1996) (Special Supp. 1995) [hereinafter *Basic Law Manual*]. The *Basic Law Manual* recognizes generally that clan membership is a highly recognizable, immutable characteristic that is acquired at birth and is inextricably linked to family ties. *Id.; Matter of Acosta, supra; see also Gomez v. INS*, 947 F.2d 660, 664 (2d Cir. 1991) (holding that a social group must be recognizable and discrete, allowing would-be persecutors to identify victims as members of the purported group).

In addition, information of record in the annual reports regarding human rights practices issued by the United States Department of State substantiates

the presence of distinct and recognizable clans and subclans in Somalia and the once-preferred position of the applicant's Marehan subclan. The *Country Reports on Human Rights Practices for 1991* relates that "[t]he 21-year rule of Mohammed Siad Barre ended in January 1991, when Siad fled an uprising in the capital, Mogadishu." Committees on Foreign Affairs and Foreign Relations, *Country Reports on Human Rights Practices for 1991,* 102d Cong., 2d Sess. 344 (Joint Comm. Print 1992) [hereinafter 1991 *Country Reports*]. The report noted that Siad was of the Marehan segment of the larger Darood clan and that the favoritism he showed toward his family and members of the Marehan clan, which resulted in their corrupt accumulation of wealth, was a common grievance among the clans which rebelled against his rule. *Id.* at 350. The report characterized Siad's successors as being 10 or more clan-based factions, the 2 most powerful among them being the United Somali Congress, predominantly of the Hawiye clan, and the Somali National Movement, predominantly of the Isaak clan. *Id.* at 344.

The respondent has demonstrated by credible evidence that he and his family are members of the Darood clan and the Marehan subclan. The record before us makes clear not only that the Marehan share ties of kinship, but that they are identifiable as a group based upon linguistic commonalities. We find, therefore, that, based upon the foregoing, the Marehan subclan can be characterized as a "particular social group" within Somalia, of which respondent is a member.

## B. Harm Suffered By the Applicant and His Family on Account of Their Subclan Membership

The situation in Somalia since 1991 presents the question of whether the widespread chaos and violence caused by civil strife and the type of individualized harm which constitutes persecution on one of the five grounds protected under our asylum laws are necessarily mutually exclusive. This Board has acknowledged that persecution can and often does take place in the context of civil war. *Matter of Villalta,* 20 I&N Dec. 142 (BIA 1990) (finding a well-founded fear of harm from paramilitary groups on account of political affiliation).[4] In the instant case, we observe that while interclan violence may fall within the general category of civil strife, that does not preclude certain acts from being persecutory and does not change the fact that certain types of harm may constitute persecution. *See* Legal Opinion, *supra*. Further, the fact that almost all Somalis can claim clan membership and that interclan conflict is prevalent should not create undue concern that virtually all Somalis would

---

[4] *See also Matter of Maldonado-Cruz*, 19 I&N Dec. 509, 513 BIA 1988)(holding that individuals harmed by threats or violence in a civil war are not *necessarily* persecuted on account of one of the five categories in section 101(a)(42)(A) of the Act), *rev'd on other grounds*, 883 F.2d 788 (9th Cir. 1989); *Matter of Fuentes*, 19 I&N Dec. 658 (BIA 1988); *Basic Law Manual, supra,* at 91.

qualify for refugee status, as an applicant must establish he is being perse-cuted on account of that membership.[5] Finally, we agree with the observation contained in the Legal Opinion that "[p]ersecution may likewise occur in the rare instance illustrated by Somalia, where there is no national government in existence." *Id.* at 5.[6]

There is considerable evidence of record that there is substantial harm inflicted on individuals in Somalia, that such injury is inflicted by members of the United Somali Congress or Hawiye clan, and that it is inflicted on iden-tifiable members of the Darood clan and the Marehan subclan. According to the 1991 *Country Reports,* during the January 1991 uprising, which produced thousands of casualties and violations of human rights, armed Hawiye gangs began attacking Darood neighborhoods in Mogadishu, resulting in the death or disappearance of hundreds of mostly Darood victims. The report further noted that "[s]ome disappearances occurred when groups resembling death squads attacked people because of their clan background and for the opportu-nity to loot their property." 1991 *Country Reports, supra,* at 345. The *Coun-try Reports on Human Rights Practices for 1992* presents an equally grim picture substantiating a pattern of anti-clan-motivated violence and persecu-tion. Committees on Foreign Relations and Foreign Affairs, *Country Reports on Human Rights Practices for 1992,* 103d Cong., 1st Sess. 235 (Joint Comm. Print 1993) [hereinafter 1992 *Country Reports*]. It is noted therein that "[i]n all areas of the country, there were summary executions of many combatants and civilians who belonged to rival clans." *Id.* at 236.

The 1992 *Country Reports* provides multiple accounts of clan-based per-secution. For example, the Report states: "There were numerous instances of torture and inhuman punishment inflicted on people solely because of their membership in a rival clan." 1992 *Country Reports, supra,* at 236. With no functioning judicial system, "clan-administered 'justice' was both arbitrary and summary" and in many cases, "the only evidence required to establish guilt was a person's clan affiliation." *Id.* This included "reports of summary executions of women and their children because they were members of a

---

[5] In *INS v. Cardoza-Fonseca, supra*, the Court recognized that Congress carefully considered arguments that the definition of "refugee" allowed for by the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102, might expand the number of refugees eligible to come to the United States and force substantially greater refugee admissions than the country could absorb. However, citing a congressional report, the Court noted that "merely because an individual or group comes within the definition will not guarantee resettlement in the United States." *INS v. Cardoza-Fonseca, supra,* at 444 (quoting H.R. Rep. No. 608, 96th Cong., 2d Sess. 10 (1979)). The Court further noted that "Congress has assigned to the Attorney General and his delegates the task of making these hard *individualized* decisions; although Congress could have crafted a narrower definition, it chose to authorize the Attorney General to determine which, if any, eligible refugees should be denied asylum." *Id.* at 444-45 (emphasis added).

[6] Efforts to establish a new government in Somalia stalled repeatedly in 1991. Although the United Somali Congress proclaimed a provisional government, it was not recognized by any of the other groups. 1991 *Country Reports, supra,* at 344.

rival clan." *Id*. at 236-37. Clan-based atrocities were not confined to Mogadishu. In attacks on communities in the southwest, the State Department noted that "victims were reportedly singled out for no reason other than their clan affiliation." *Id*. at 237.

The evidence contained in the *Country Reports* of repeated clan-motivated attacks by the Hawiye or United Somali Congress on the Marehan and Darood clans is consistent with the applicant's testimony that his father, a Marehan businessman, was murdered at his place of business in Mogadishu; that the family home in a Marehan neighborhood was targeted; and that his brother, also a Marehan, was murdered in a Mogadishu hospital to which he had been taken for treatment of injuries that he sustained when the family home was attacked. The applicant himself fled with his remaining family to Kismayu, where he was captured, detained, and beaten severely. The persecution suffered by the applicant also was at the hands of members of the United Somali Congress and occurred when the Hawiye stormed Kismayu, a location where many Darood were known to reside.

Eventually, during the period covered by the 1992 *Country Reports,* the applicant and his family escaped from Somalia and sought refuge in Kenya. That report notes that 320,000 Somali refugees were in Kenya and that the United Nations High Commissioner for Refugees was unable to undertake an organized repatriation program due to continuing insecurity and intraclan fighting. *Id.* at 238. Finally, the *Country Reports on Human Rights Practices for 1993* notes the presence of United Nations forces in Somalia, but concludes that "[e]ven with the presence of United Nations peacekeepers, many Somalis remain beyond the rule and protection of recognized law and social order. . . . Traditional authorities, unable to cope with the unprecedented conditions of the country, have often withdrawn from their historical function, leaving the clans and subclans without the restraints that would serve to protect human rights." Committees on Foreign Affairs and Foreign Relations, *Country Reports on Human Rights Practices for 1993*, 103d Cong., 2d Sess. 258, (Joint Comm. Print 1994).

In light of the corroborative information of record provided by the Department of State and the *Basic Law Manual*, as well as the applicant's testimony, we find the applicant has met his burden and has set forth a persuasive account of the persecution that he suffered in Somalia. *Matter of Mogharrabi, supra*, (stating that evidence of treatment of persons similarly situated is persuasive of an applicant's claim of political persecution). One month prior to the persecution that the applicant suffered, his father and brother were murdered in separate incidents on the basis of their membership in the clan. Because of the applicant's clan membership he was detained and severely beaten; he bears scars from the beatings. That the applicant was persecuted in the context of clan warfare does not undermine his claim. The motivation of the persecutors reasonably appears to be, as the applicant contends, on account of his subclan affiliation. He presented an individualized

claim which reflected that he became the object of harm and was physically abused simply because he was identified with the former ruling faction by being a member of the Marehan clan. Accordingly, we find that the applicant suffered persecution in Somalia on account of his membership in a particular social group, to wit, the Marehan clan.

## V. ADJUDICATION OF ASYLUM REQUESTS INVOLVING PAST PERSECUTION

### A. Regulatory Presumption of the Well-Founded Fear of Future Persecution

A finding of past persecution gives rise to a regulatory presumption that the applicant has a well-founded fear of future persecution. *See* 8 C.F.R. § 208.13(b)(1)(i). The regulations provide in pertinent part that an applicant who has established past persecution

> shall be presumed also to have a well-founded fear of persecution unless a preponderance of the evidence establishes that since the time the persecution occurred conditions . . . have changed to such an extent that the applicant no longer has a well-founded fear.

8 C.F.R. § 208.13(b)(1)(i). They further provide as follows:

> An application for asylum shall be denied if the applicant . . . is determined not also to have a well-founded fear of future persecution . . . unless it is determined that the applicant has demonstrated compelling reasons for being unwilling to return . . . arising out of the severity of the past persecution.

8 C.F.R. § 208.13(b)(1)(ii).

An alien who has demonstrated past persecution is not separately required by 8 C.F.R. § 208.13(b)(1)(ii) to demonstrate compelling reasons for being unwilling to return to his or her country of nationality or last habitual residence in order to be granted asylum. Rather, he or she is considered to have established eligibility for asylum both on account of the past persecution which has been demonstrated and the well-founded fear of future persecution which is presumed. The need to demonstrate compelling reasons for being unwilling to return resulting from the severity of the past persecution suffered by the applicant only arises if the presumption of a well-founded fear of future persecution is successfully rebutted.

To overcome the regulatory presumption, the record must reflect, by a preponderance of the evidence, that since the time the persecution occurred, conditions in the applicant's country of nationality or last habitual residence have changed to such an extent that the applicant no longer has a well-founded fear of being persecuted if he or she were to return to that country. 8 C.F.R. § 208.13(b)(1)(i). As a practical matter, it will be the Service's burden to rebut the presumption, whether by adducing additional evidence or resting upon evidence already in the record. We reiterate that notwithstanding such circumstances, for compelling reasons, an applicant may be

afforded asylum even where the evidence establishes such a change in conditions that he or she may be found to no longer have a well-founded fear of persecution. *Matter of B-, supra; Matter of Chen, supra*; 8 C.F.R. § 208.13(b)(1)(ii). Compelling reasons arising out of the severity of the past persecution suffered may be found on the basis of evidence already in the record or by presentation of additional evidence by the applicant.

## B. Exercise of Discretion

Statutory and regulatory eligibility for asylum, whether based on past persecution or a well-founded fear of future persecution, does not necessarily compel a grant of asylum. *INS v. Cardoza-Fonseca, supra*. An applicant for asylum has the burden of establishing that the favorable exercise of discretion is warranted. *Matter of Pula*, 19 I&N Dec. 467 (BIA 1987); *Matter of Shirdel*, 19 I&N Dec. 33 (BIA 1984). Factors which fall short of the grounds of mandatory denial may constitute discretionary considerations. In exercising discretion, the Board has considered it appropriate to examine the totality of the circumstances and actions of an alien in his or her flight from the country where persecution is feared. *Matter of Pula, supra*. Once an applicant has established that he or she is a refugee on the basis of past persecution, a grant of asylum may, in select circumstances and as a matter of discretion, be founded solely on the basis of past persecution. *See Matter of B-, supra; Matter of Chen, supra*; 8 C.F.R. § 208.13(b)(1)(ii).

As with any adjudication under section 208 of the Act where past persecution has been established, either party may proffer evidence relevant to the discretionary aspect of the case. Both the regulations and this Board's caselaw provide guidance as to the factors to be considered by the Immigration Judge in the exercise of discretion. *See Matter of B-, supra; Matter of Chen, supra; Matter of Pula, supra*; 8 C.F.R. § 208.13(b)(1)(ii).

Central to a discretionary finding in past persecution cases should be careful attention to compelling, humanitarian considerations that would be involved if the refugee were to be forced to return to a country where he or she was persecuted in the past. 8 C.F.R. 208.13(b)(1)(ii); *see also Matter of Chen, supra* (citing Office of the United Nations High Commissioner for Refugees, *Handbook on Procedures and Criteria for Determining Refugee Status Under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* (Geneva, 1988)). We note that the regulation follows the principle set forth by the Board in *Matter of Chen, supra*, that, in certain instances, asylum should be granted in the exercise of discretion, even where there is little likelihood of future persecution, such as where the asylum applicant has suffered such severe persecution that he or she should not be expected to repatriate. *See also Matter of B-, supra.*

Our caselaw also recognizes that general humanitarian reasons, independent of the circumstances that led to the applicant's refugee status, such as his

or her age, health, or family ties, should also be considered in the exercise of discretion. *Matter of Pula, supra.* Although the totality of circumstances and actions of an alien in his or her flight from the country where persecution was suffered to the United States are to be considered, and may weigh against a favorable exercise of discretion, "the danger of persecution should generally outweigh all but the most egregious of adverse factors." *Matter of Pula, supra*, at 474.

## C. Procedural Approach in Claims Involving Past Persecution

The adjudication of a claim of past persecution is in the first instance with the Immigration Judge. A finding of past persecution within the meaning of the Act triggers the presumption that there exists a well-founded fear of future persecution. 8 C.F.R. § 208.13(b)(1)(i). Should the Immigration Judge determine that past persecution has been established, the regulations envision that he or she ordinarily will proceed to accept further evidence concerning the presumption of a well-founded fear of persecution, any evidence of a change in country conditions as contemplated by the regulations, and other discretionary issues as discussed in this decision. *See Matter of B-, supra; Matter of Chen, supra; Matter of Pula, supra;* 8 C.F.R. § 208.13(b)(1)(ii).

In these proceedings, it was first determined by the Board, rather than the Immigration Judge, that the applicant established past persecution on account of his membership in a particular social group. In cases where cognizable issues of past persecution arise, in the interest of a fair and efficient adjudication of the case, the parties should ordinarily present sufficient evidence to allow the Immigration Judge to consider and resolve all relevant issues and avoid the necessity for remand if the Board ultimately determines that the applicant has shown past persecution. Here, that was not done.

Consequently, although we have found that the applicant suffered persecution in Somalia on account of his membership in a particular social group, the record of proceedings is not sufficiently developed for the Board to reach a decision as to whether the applicant is entitled to asylum in the United States pursuant to section 208(a) of the Act, or, as to whether his deportation to Somalia must be withheld pursuant to section 243(h) of the Act. Accordingly, we remand the proceedings for the further development of those issues before the Immigration Judge.

In the instant proceedings, we provide the Service, as well as the applicant, the opportunity to adduce evidence regarding current country conditions in Somalia. The parties will also have the opportunity to introduce any evidence or information relevant to the exercise of discretion. On remand the Immigration Judge should consider the following: the conditions that the applicant would face in Somalia; the possibility of future persecution; the degree of the persecution suffered by the applicant; and humanitarian considerations relevant to the applicant's case.

Insofar as the issue of this applicant's sojourn outside of Somalia may be relevant to the Immigration Judge's determination on remand, it would be appropriate for the Immigration Judge to consider the circumstances of the applicant's stay in Kenya based upon any information presented by the parties. Particular attention should be given to whether the applicant, while resident in a refugee camp in Kenya, was provided protection against *refoulement* consistent with the United States' commitment to *nonrefoulment* which is embodied in its ratification of the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U.S.T. 6223, T.I.A.S. No. 6577, 606 U.N.T.S. 267. Further, it may be relevant to address the issue of country-wide persecution and whether the applicant could avoid persecution anywhere in Somalia.[7]

## VI. CONCLUSION

This Board has found that the applicant in these proceedings suffered past persecution. It is now for the Immigration Judge to consider and rule upon any factors relevant to the ultimate disposition of the application for relief. We emphasize that by the remand of these proceedings, we in no way suggest a desired disposition before the Immigration Judge.

Accordingly, the following order is entered.

**ORDER:**    The record is remanded to the Office of the Immigration Judge for further proceedings consistent with this decision.

*DISSENTING OPINION:* Michael J. Heilman, Board Member

I respectfully dissent.

There is an account of an argument that took place toward the close of the first century between a rabbi and his colleagues. *See The Babylonian Talmud,* Baba Mezi'a 59a-b (I. Epstein ed. & H. Freedman trans., The Soncino Press new ed. 1971)(1962). The rabbi, having exhausted his arsenal of reasoning and still not having convinced them, performed a miracle. His colleagues told him that there was no room for miracles in debate. In exasperation, he then called upon heaven to show the correctness of his argument. Thereupon, a celestial voice declared, "What have you against the rabbi, for his teaching is correct?" But this intervention was ruled out of order, because in the Bible it is written that decisions are to be reached by majority vote.

---

[7] This Board has found that it is appropriate to consider in the exercise of discretion whether an applicant, who is eligible for asylum based upon a well-founded fear of persecution, has the ability and can reasonably be expected to relocate in his or her home country. *Matter of R-,* 20 I&N Dec. 621 (BIA 1992). Where, as here, the well-founded fear is of a nongovernmental authority, the question arises as to whether that authority has the ability to persecute the applicant throughout the home country, and whether the applicant would have to pass through any unsafe part of Somalia. In particular, should the Service contend that the applicant would not face persecution throughout Somalia, the Service should clarify how it accomplishes the deportation of such individuals to a protected area.

Though I am no rabbi, and have not called for celestial intervention, I fear it would prove as convincing to a majority of this Board as it did to the rabbi's colleagues. We also operate by majority vote.

With this decision, we have now joined the United States Court of Appeals for the Ninth Circuit in its quixotic attempt to right the wrongs of the world through the asylum process. For all intents and purposes, the majority has concluded that all persons who have been harmed or who fear harm due to civil war will be entitled to asylum in the United States. I see the situation differently, and do not understand the Refugee Act of 1980 to accord protection to members of warring clans in Somalia. Indeed, if one pursues the majority's logic, all warring sides persecute one another, and this means that all civil wars are nothing more than acts of persecution. The implications of such a sweeping conception of "persecution" should give us all pause.