**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-4378
_____

HILAIRE DIALLO KARANGWA,
Petitioner

v.

ATTORNEY GENERAL OF THE UNITED STATES OF AMERICA,
Respondent

_____

On Petition for Review of an Order
of the Board of Immigration Appeals
(Agency No. A098-866-601)
Immigration Judge: Charles M. Honeyman
_____

Submitted Under Third Circuit L.A.R. 34.1(a)
March 22, 2016
_____

Before: GREENAWAY, JR., VANASKIE, and SHWARTZ, *Circuit Judges*.

(Opinion Filed: May 20, 2016)
_____

OPINION[*]
_____

VANASKIE, *Circuit Judge*.

Petitioner Hilaire Diallo Karangwa seeks review of an order of the Board of

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

Immigration Appeals ("BIA") affirming an Immigration Judge's ("IJ") denial of his petition for asylum, withholding of removal, and protection under the Convention Against Torture ("CAT"). Because we find that Karangwa has not met the high burden of proving that the BIA's determination is unsupported by substantial evidence, we will deny his petition for review.

## I.

Karangwa is a native and citizen of Rwanda who considers himself of Hutu ethnicity, like his father, although his mother is of Tutsi ethnicity. In 1994, around the start of the Rwandan genocide, Karangwa and his mother were beaten by members of the Interahamwe, one of the groups responsible for the genocide, who threatened to kill them because they believed Karangwa and his mother to be Tutsi. Karangwa was eventually identified as Hutu and, along with his mother, was permitted to return home. Karangwa remained in Rwanda for several more years and did not allege any further incidents of physical harm, although he claimed that he was subject to questioning during the genocide and that many of his neighbors were later taken into custody for genocide and killed.

In 2000, Karangwa came to the United States to study at La Roche College. He graduated in 2004, but the Department of Homeland Security ("DHS") permitted him to stay in the country to participate in an Optional Practical Training program for non-immigrant students until June of 2005.

2

Also in mid-2005, Karangwa discovered that his name had been mentioned in connection with a murder that took place during the Rwandan genocide and that two of his brothers were being summoned before the Rwandan Gacaca court system on allegations that they also were involved with the murder.[1] After learning about the charges and hearing about other Hutus who were falsely accused and prosecuted for crimes in the Gacaca courts, Karangwa decided to remain in the United States. He filed an asylum application with DHS in August of 2005 and his application was referred to the immigration court for adjudication.

In May of 2006, DHS began removal proceedings against Karangwa on the grounds that he was removable under 8 U.S.C. § 1227(a)(1)(C)(i) as an alien who failed to comply with the conditions of his non-immigrant status. He conceded his removability, but renewed his application for asylum and requested withholding of removal and CAT protection because of false accusations that he was involved with the 1994 genocide and the possibility that he would be charged for murder in the Gacaca court system. Karangwa argued that persecution would be inflicted upon him because he was Hutu and because there was a widespread dislike for his family because of its status and wealth. Karangwa's counsel advised the IJ that the focus of the application was a claim of fear of future persecution and torture. As an alternative to his claims for relief

_____

[1] The Gacaca courts are community-based tribunals formed to adjudicate charges arising from the 1994 genocide. One of Karangwa's brothers, Pierre, was arrested and spent time in prison as a result of having been charged with participating in the genocide. Both brothers were eventually exonerated and have not been called back to the Gacaca courts, although Karangwa claims that they fear being charged again.

and protection against torture, Karangwa requested that he be afforded the right of voluntary departure instead of removal.

At the evidentiary hearing held by the IJ on January 7, 2010, Karangwa submitted evidence that the Gacaca court system was unfair and was sometimes misused for personal grudges. He also submitted evidence that the system did not allow defendants to have lawyers and often led to lengthy pre-trial detentions under harsh and abusive conditions. Karangwa also claimed that shortly before his immigration hearing his mother and sister informed him that he was still being threatened with prosecution if he returned to Rwanda. The only documentary evidence of threatened prosecution that he submitted, however, were emails from siblings and family in Rwanda no more recent than October of 2008. The emails did not provide any detailed information about threats of prosecution. In April of 2010, the IJ denied Karangwa's application for asylum, withholding of removal, and CAT protection and ordered him removed to Rwanda. The IJ did not address Karangwa's request for voluntary departure.

Karangwa appealed to the BIA, which ultimately dismissed his appeal, but remanded the matter to the IJ for further proceedings regarding Karangwa's request for voluntary departure.[2] In its opinion, the BIA determined that: (1) Karangwa's one allegation of past physical harm was insufficient to meet the burden for showing past

---

[2] In May of 2014, Karangwa filed a motion with the BIA to reopen his claim based on incidents involving his brothers in Rwanda and withdrew his application for voluntary departure. In July of 2015, the BIA denied Karangwa's motion to reopen. Karangwa did not appeal that decision and it is not before this Court.

persecution; (2) there was no clear error in the IJ's finding that Karangwa had not met the burden of showing that he faces a current threat of prosecution in the Gacaca court system and there was no objective, reasonable basis for his fear of future persecution; and (3) there was no clear error in the IJ's finding that Karangwa did not meet his burden of proving that he would more likely than not be tortured upon his return to Rwanda for the purposes of CAT protection.

## II.

The BIA had jurisdiction over this action under 8 C.F.R. §§ 1003.1(b) and 1240.15. We have jurisdiction to review final decisions of the BIA under 8 U.S.C. § 1252(a)(5). Our review, however, is restricted to the administrative record. 8 U.S.C. § 1252(b)(4)(A). We review the determinations of both the IJ and the BIA where, as here, the BIA not only affirms the IJ's conclusions, but also adds its own explication of its ultimate findings. *See Camara v. Att'y Gen.*, 580 F.3d 196, 201 (3d Cir. 2009). We will affirm those determinations unless the evidence *compels* us to conclude otherwise. *See* 8 U.S.C. § 1252(b)(4)(B); *INS v. Elias-Zacarias*, 502 U.S. 478, 481 n.1 (1992).

## III.

In support of his petition for review, Karangwa puts forth the following arguments: (1) the BIA erred in affirming the IJ's determination that Karangwa did not meet his burden for showing past persecution; (2) the BIA erred by affirming the IJ's finding that Karangwa did not meet the burden of showing a well-founded fear of future persecution; and (3) the BIA erred in affirming the IJ's finding that Karangwa had not

5

met the burden of proof for obtaining protection under the CAT. We will address each argument in turn.

A.

One basis for securing asylum is to show past persecution because of the asylum applicant's "race, religion, nationality, membership in a particular social group, or political opinion." *See* 8 U.S.C. § 1101(a)(42); *In re H-*, 21 I. & N. Dec. 337, 339 (BIA 1996) ("Both this Board and the federal courts have recognized past persecution as a basis for granting asylum."). Persecution is defined as "threats to life, confinement, torture, and economic restrictions so severe that they constitute a real threat to life or freedom." *Lukwago v. Ashcroft*, 329 F.3d 157, 168 (3d Cir. 2003) (citations omitted).

Karangwa's claim for past persecution relies on analogizing his case to *In re H-*. In that case, the applicant had been a native of Somalia and a member of the Marehan subclan. The BIA found that the applicant had suffered past persecution after crediting findings that his father and brother had been murdered, his family home had been targeted, and the applicant himself had been captured, detained, and severely beaten because of his membership in the Marehan clan. 21 I. & N. Dec. at 345–46. The BIA noted that information provided by the Department of State supported the conclusion that there was "continuing insecurity and intraclan fighting" in Somalia and that clans and subclans were left "without the restraints that would serve to protect human rights." *Id.* (citations omitted). Karangwa argues that his claim for past persecution should also be recognized because, similarly, he is a member of a persecuted tribe, the Hutus, had family

members killed during the genocide, and he and his mother were beaten and forced into hiding during the genocide.

The facts of Karangwa's case, however, do not compel a finding of past persecution, which would be required to overcome the substantial deference owed to the BIA here. Unlike the applicant in *In re H-*, who was forced to leave the country for his safety, Karangwa continued to live in Rwanda for several years after the incidents upon which he bases his claim for past persecution and did not suffer any further harm. Also unlike the situation in *In re H-*, the only incident in which Karangwa claims that he was personally persecuted was based on a belief that Karangwa was Tutsi, not on the basis that he was Hutu. Furthermore, Karangwa's counsel had notified the IJ that fear of future persecution, not past persecution, was the basis of Karangwa's claim for asylum. Thus, the BIA's determination that Karangwa has not met the burden of showing past persecution is supported by substantial evidence.

B.

Another basis for securing asylum is to show a fear of future persecution. In this context, we must uphold the BIA's determination if it is "supported by reasonable, substantial, and probative evidence on the record considered as a whole." *Elias-Zacarias*, 502 U.S. at 481 (citation omitted). The petitioner has the burden to show that "the evidence presented . . . was such that a reasonable factfinder would have to conclude that the requisite fear of persecution existed." *Id.* The petitioner additionally must show that the fear is "subjectively genuine and objectively reasonable." *Chavarria v.*

7

*Gonzalez*, 446 F.3d 508, 520 (3d Cir. 2006). Nonetheless, an applicant's "fear may be well-founded even if there is only a slight, though discernible, chance of persecution." *Diallo v. INS*, 232 F.3d 279, 284 (3d Cir. 2002) (citing *INS v. Cardoza-Fonseca*, 480 U.S. 421, 431 (1987).

Karangwa argues that that the IJ and the BIA improperly weighed the threats against him and misapplied the law regarding the standard of proof to demonstrate a well-founded fear of future persecution. Furthermore, he argues that the IJ and the BIA improperly weighed evidence of the risk that he would be persecuted because of his ethnicity, his family, and his family's wealth. He cites to Ninth Circuit precedent in *Himri v. Ashcroft*, 378 F.3d 932, 936 (9th Cir. 2004), to say that "an individual with even a ten percent (10%) likelihood of being persecuted can establish a well-founded fear of persecution." (Pet'r Br. at 20.) Karangwa argues that

> no reasonable person could conclude given the fact that both of [his]
> brothers were charged and tried in the Gacaca courts and at least one
> brother was arrested and imprisoned on five different occasions, that there
> is not at least a ten percent (10%) chance that [he] will be arrested,
> imprisoned and charged on account of either his Hutu ethnicity. . . , his
> family, his family's wealth or a combination thereof.

(Pet'r Br. at 22.)

The facts of Karangwa's case, however, do not compel a finding that there is at least a ten percent chance that he will be prosecuted upon returning to Rwanda. The BIA's opinion shows that it considered the record as a whole when it affirmed the IJ's determination that Karangwa did not show an objective basis for a well-founded fear of

future persecution. The BIA specifically noted that both of Karangwa's brothers were exonerated through the Gacaca court system and have not been re-charged. The BIA also considered it significant that since 2008 there has been no evidence that prosecutors have any interest in Karangwa. The BIA thus had ample evidentiary support for the rational conclusion that there is no objective basis for Karangwa's fear that he will face prosecution in the Gacaca courts if he returns to Rwanda. Accordingly, Karangwa has not carried his substantial burden of showing that the evidence compels the conclusion that he is entitled to asylum.

## C.

Finally, Karangwa's arguments that the BIA erred in determining that he had not proven his CAT claim must fail. The standard for protection under the CAT is heightened as compared to the well-founded fear standard for asylum. *See Yu v. Att'y Gen.*, 513 F.3d 346, 349 (3d Cir. 2008) ("Since the threshold for asylum is lower than for protection under the withholding of removal or CAT provisions, rejection of the petitioners' asylum claims necessarily requires that their CAT and withholding claims be rejected as well."). Because Karangwa was unable to meet the burden of proof for overturning the BIA's determination on his asylum claim, he necessarily is unable to meet the burden of proof for overturning the BIA's decision regarding his CAT claim.

## IV.

For the aforementioned reasons, we will deny Karangwa's petition for review.