# Matter of L-E-A-, Respondent

*Decided by Attorney General July 29, 2019*

U.S. Department of Justice
Office of the Attorney General

(1) In *Matter of L-E-A-*, 27 I&N Dec. 40 (BIA 2017), the Board of Immigration Appeals improperly recognized the respondent's father's immediate family as a "particular social group" for purposes of qualifying for asylum under the Immigration and Nationality Act.

(2) All asylum applicants seeking to establish membership in a "particular social group," including groups defined by family or kinship ties, must establish that the group is (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question.

(3) While the Board has recognized certain clans and subclans as "particular social groups," most nuclear families are not inherently socially distinct and therefore do not qualify as "particular social groups."

(4) The portion of the Board's decision recognizing the respondent's proposed particular social group is overruled. *See Matter of L-E-A-*, 27 I&N Dec. at 42–43 (Part II.A). The rest of the Board's decision, including its analysis of the required nexus between alleged persecution and the alleged protected ground, is affirmed. *See id*. at 43–47 (Part II.B).

## BEFORE THE ATTORNEY GENERAL

The Immigration and Nationality Act ("INA") authorizes the Attorney General to grant asylum, in his discretion, if an alien establishes that he is unable or unwilling to return to his country of origin because he has suffered past persecution or has a well-founded fear of future persecution on account of "race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(A), 1158(b)(1)(A), (B)(i). This case once again requires interpretation of what it means to suffer persecution on account of "membership in a particular social group," an ambiguous term that has required repeated construction by the Board of Immigration Appeals (the "Board"), the Attorney General, and the U.S. Courts of Appeals.

The respondent contends that he was persecuted by a criminal gang on account of his membership in the "particular social group" defined as the "immediate family of his father," who owned a store targeted by a local drug cartel. Under existing Board precedent, a particular social group must share "a common immutable characteristic" that is defined with particularity and

"set apart, or distinct, from other persons within the society in some significant way." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 238 (BIA 2014); *see also Matter of W-G-R-*, 26 I&N Dec. 208, 217 (BIA 2014). The alien bears the burden of showing that his proposed group meets these criteria, *see* 8 U.S.C. § 1158(b)(1)(B)(i), and he will not satisfy that burden solely by showing that his social group has been the target of private criminal activity. The fact that a criminal group—such as a drug cartel, gang, or guerrilla force—targets a group of people does not, standing alone, transform those people into a particular social group. *See, e.g.*, *Matter of S-E-G-*, 24 I&N Dec. 579, 586–87 (BIA 2008) (concluding that respondents who feared harm from their refusal to join MS-13 were not a "particular social group"; they were "not in a substantially different situation from anyone [else] who has crossed the gang, or who is perceived to be a threat to the gang's interests"); *Matter of Acosta*, 19 I&N Dec. 211, 234 (BIA 1985) (working as a taxi driver and "refusing to participate in guerrilla-sponsored work stoppages" at risk to personal safety did not create "particular social group" status).

At the same time, the Board has recognized that a clan or similar group bound together by common ancestry, cultural ties, or language *may* constitute a "particular social group." *Matter of H-*, 21 I&N Dec. 337, 343 (BIA 1996) (describing the relevant "distinct and recognizable clans and subclans in Somalia"); *Acosta*, 19 I&N Dec. at 233 (calling for a case-by-case determination of whether innate characteristics like "sex, color, or kinship ties" qualify as "particular social group" characteristics). But what qualifies certain clans or kinship groups as particular social groups is not merely the genetic ties among the members. Rather, it is that those ties or other salient factors establish the kinship group, on its own terms, as a "recognized component of the society in question." *W-G-R-*, 26 I&N Dec. at 217. In that respect, the large and prominent kinship and clan groups that have been recognized by the Board as cognizable particular social groups stand on a very different footing from an alien's immediate family, which generally will not be distinct on a societal scale, whether or not it attracts the attention of criminals who seek to exploit that family relationship in the service of their crimes.

Consistent with these prior decisions, I conclude that an alien's family-based group will not constitute a particular social group unless it has been shown to be socially distinct in the eyes of its society, not just those of its alleged persecutor. *See M-E-V-G-*, 26 I&N Dec. at 237; *W-G-R-*, 26 I&N Dec. at 215–18. Because the record does not support the determination in this case that the immediate family of the respondent's father constituted a particular social group, I reverse the Board's conclusion to the contrary.

## I.

In 1998, the respondent, a Mexican citizen, illegally entered the United States. After a criminal conviction for driving under the influence, the Department of Homeland Security ("DHS") initiated removal proceedings. The respondent accepted voluntary departure and returned to Mexico in May 2011. But he did not stay there long. By August 2011, the respondent had again illegally returned to the United States. DHS apprehended him and commenced removal proceedings. The respondent conceded removability, but this time sought asylum based upon a claim of persecution allegedly suffered during his brief return to Mexico.

According to the respondent, upon returning to Mexico, he had gone to live with his parents in Mexico City. His father operated a neighborhood general store there, but he had run afoul of La Familia Michoacana, a Mexican drug cartel. Because his father refused to sell the cartel's drugs out of his store, the drug dealers evidently decided to retaliate against the respondent upon his return. About a week after returning to Mexico City, the respondent was walking a few blocks from his home when he heard gunshots coming out of a black sport-utility vehicle. He dropped down to the ground and was unharmed. Although the respondent did not initially believe that he was the target of the shooting, he later concluded that he was, based upon the cartel's subsequent actions.

About a week later, four armed cartel members, driving the same black sport-utility vehicle, approached the respondent and asked him to agree to sell the cartel's drugs at his father's store. When the respondent declined, the cartel members threatened him and advised him to reconsider. Shortly thereafter, four masked men, in the same sport-utility vehicle, attempted to kidnap the respondent, but he managed to escape. After that incident, the respondent left Mexico City for Tijuana, where two months later, he illegally crossed back into the United States and was thereafter apprehended.

In his removal proceeding, the respondent claimed persecution in Mexico based on his membership in the particular social group comprising his father's immediate family. The immigration judge denied relief on the ground that the respondent had not shown he was the victim of anything more than criminal activity.

On appeal, the Board found that the respondent's relationship with his father established membership in a particular social group, namely "his father's immediate family." *Matter of L-E-A-*, 27 I&N Dec. 40, 43 (BIA 2017). In reaching that conclusion, the Board relied upon DHS's concession "that the immediate family unit of the respondent's father qualifies as a cognizable social group." *Id.* at 42; *see also* DHS Supplemental Brief at 20

("In this case, the Department stipulates that the immediate family unit of the respondent's father qualifies as a cognizable particular social group."). The Board recognized that, under the relevant precedents, a family-related group must satisfy the requirements of particularity and social distinction to qualify as a "particular social group" under the INA. *L-E-A-*, 27 I&N Dec. at 42. And the Board noted that such a determination requires "a fact-based inquiry made on a case-by-case basis," and will not be satisfied by "all social groups that involve family members." *Id.* at 42–43. But the Board did not perform such an inquiry; instead, it summarily concluded that "[i]n consideration of the facts of this case *and the agreement of the parties*, we have no difficulty identifying the respondent, a son residing in his father's home, as being a member of the particular social group comprised of his father's immediate family." *Id.* (emphasis added).

Although it approved the claimed social group, the Board denied the respondent's asylum application because of the absence of the necessary nexus between his membership in the group and the persecution. *Id*. at 43–47. The Board explained that "[a] persecution claim cannot be established if there is no proof that the applicant or other members of the family were targeted because of the family relationship." *Id.* at 43. Here, the Board concluded, the respondent was approached by the cartel "because he was in a position to provide access to the store, not because of his family membership." *Id*. at 46. He "was targeted only as a means to achieve the cartel's objective to increase its profits by selling drugs in the store owned by his father," and "[a]ny motive to harm the respondent because he was a member of his family was, at most, incidental." *Id.* As the Board noted, "the fact that a persecutor targets a family member simply as a means to an end is not, by itself, sufficient to establish a claim, especially if the end is not connected to another protected ground." *Id*. at 45.

The Board remanded the matter to the immigration judge for consideration of the respondent's additional claim for protection under the U.N. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT"). *Id*. at 47.

On December 3, 2018, Acting Attorney General Whitaker directed the Board to refer its decision for review, *see* 8 C.F.R. § 1003.1(h)(1)(i), staying the proceedings and inviting briefing on whether, and under what circumstances, an alien may establish persecution on account of membership in a "particular social group" based on the alien's membership in a family unit. *Matter of L-E-A-*, 27 I&N Dec. 494, 494 (A.G. 2018).

## II.

Before turning to the merits, I address several threshold arguments raised by the respondent about my authority to review this case. First, the respondent argues that the Acting Attorney General could not certify this matter for review because the Board had remanded the case to the immigration judge for further proceedings. As *Matter of A-B-* recognized, "[n]othing in the INA or the implementing regulations precludes the Attorney General from referring a case for review simply because the Board has remanded the case for further proceedings before an immigration judge." 27 I&N Dec. 316, 323–24 (A.G. 2018). I therefore reject this argument for the reasons stated in that opinion.

Second, the respondent argues that the Acting Attorney General had no authority to refer this case because he was not properly appointed to his position. But the President's designation of Mr. Whitaker as Acting Attorney General was expressly authorized by the Federal Vacancies Reform Act of 1998, 5 U.S.C. §§ 3345–3349d, and was consistent with the Appointments Clause of the Constitution, U.S. Const. art. II, § 2, cl. 2. *See Designating an Acting Attorney General*, 42 Op. O.L.C. __ (Nov. 14, 2018). In any event, that question is now moot, because the respondent has not argued, and cannot argue, that my appointment as Attorney General is subject to such a challenge. As Attorney General, I have the authority to ratify the initial certification (which I hereby do), and I have decided this case based upon my own independent review of the record. *See Wilkes-Barre Hosp. v. NLRB*, 857 F.3d 364, 371 (D.C. Cir. 2017) ("[R]atification can remedy a defect arising from the decision of 'an improperly appointed official . . . when . . . a properly appointed official has the power to conduct an independent evaluation of the merits and does so.'" (quoting *Intercollegiate Broad. Sys., Inc. v Copyright Royalty Bd.*, 796 F.3d 111, 117 (D.C. Cir. 2015))). Therefore, the validity of the Acting Attorney General's appointment is not relevant to my disposition of this case.

Third, the respondent contends that my prior statements regarding asylum and immigration issues prevent me from acting as an unbiased adjudicator. But I "have made no public statements regarding the facts of respondent's case, and I have no 'personal interest in the outcome of the proceedings.'" *A-B-*, 27 I&N Dec. at 325 (quoting *Strivers v. Pierce*, 71 F.3d 732, 741 (9th Cir. 1995)); *see also Ass'n of Nat'l Advertisers, Inc. v. FTC*, 627 F.2d 1151, 1168 (D.C. Cir. 1979) (finding that policymakers do not have to retreat from "interchange and discussion about important issues").

Finally, the respondent argues that I do not have jurisdiction to render a decision because the immigration judge never properly acquired jurisdiction.

The respondent contends that jurisdiction never vested because the charging document lacked all of the information required by the INA and 8 C.F.R. § 1003.15—namely, the notice to appear did not include the time and place of the first hearing in this matter. But the Board has previously ruled that similar notices are adequate to establish jurisdiction, so long as subsequent notices provide that information. *Matter of Bermudez-Cota*, 27 I&N Dec. 441 (BIA 2018); *see also Karingithi v. Whitaker*, 913 F.3d 1158, 1161 (9th Cir. 2019) (holding that *Bermudez-Cota* permissibly interpreted the relevant regulations). Further, neither the INA nor 8 C.F.R. § 1003.15 specifies that the notice to appear must contain such details about the first hearing. *See id.* § 1003.15(b). And the relevant jurisdictional regulation, 8 C.F.R. § 1003.14(a), "does not specify what information must be contained in a 'charging document' at the time it is filed with an Immigration Court, nor does it mandate that the document specify the time and date of the initial hearing before jurisdiction will vest." *Bermudez-Cota*, 27 I&N Dec. at 445. Although that information was not contained in the initial notice to appear, the immigration court subsequently issued a notice of hearing with all the required information. *See Matter of L-E-A-*, Notice of Hearing (Immig. Ct. Aug. 17, 2011). Therefore, this jurisdictional challenge does not block my review.

## III.

Turning now to the merits, I conclude that the Board erred in finding that the respondent's purported social group—the members of his father's immediate family—qualified as a "particular social group" under the INA. All particular social groups must satisfy the criteria set forth in *Matter of M-E-V-G-* and *Matter of W-G-R-*, and a proposed family-based group is no different. An applicant must establish that his specific family group is defined with sufficient particularity and is socially distinct in his society. In the ordinary case, a family group will not meet that standard, because it will not have the kind of identifying characteristics that render the family socially distinct within the society in question. The Board here did not perform the required fact-based inquiry to determine whether the respondent had satisfied his burden of establishing the existence of a particular social group within the legal requirements of the statute. The Board's summary conclusions, based on DHS's stipulation rather than its own legal analysis, must therefore be reversed.

## A.

An applicant for asylum bears the burden of establishing that he "is a refugee, within the meaning of section 1101(a)(42)(A)" of the INA. 8 U.S.C. §§ 1158(b)(1)(A), (B)(i). To meet that definition, the applicant must demonstrate that he is an alien outside his country of nationality "who is unable or unwilling to return to, and is unable or unwilling to avail himself . . . of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, *membership in a particular social group*, or political opinion." 8 U.S.C. § 1101(a)(42)(A) (emphasis added). No statute or regulation defines what constitutes a "particular social group."

The Board first interpreted "persecution on account of membership in a particular social group" in *Acosta*, 19 I&N Dec. at 232–34. Noting that this provision "was added as an afterthought" to the CAT and that "Congress [similarly] did not indicate what it understood this ground of persecution to mean," *id.* at 232, the Board turned to the language itself:

> A purely linguistic analysis of this ground of persecution suggests that it may encompass persecution seeking to punish either people in a certain relation, or having a certain degree of similarity, to one another or people of like class or kindred interests, such as shared ethnic, cultural, or linguistic origins, education, family background, or perhaps economic activity.

*Id.* at 232–33. Applying the doctrine of *ejusdem generis*, the Board read "particular social group" in a manner consistent with the other statutory grounds for persecution: race, religion, nationality, and political opinion. *Id.* at 233. Because each of these terms describes "a characteristic that either is beyond the power of an individual to change or is so fundamental to an individual's identity or conscience that it ought not be required to be changed," the Board concluded that "membership in a particular social group" must similarly involve the sharing of a "common, immutable characteristic." *Id.* According to the Board, "[t]he shared characteristic might be an innate one such as sex, color, or kinship ties," and immigration judges should engage in a case-by-case analysis to determine whether a particular innate characteristic would qualify. *Id.* The Board did not clarify whether the sharing of a "common, immutable characteristic" was a sufficient, as opposed to just a necessary, condition for qualifying as a particular social group under the statutory definition of "refugee." *See id.*

In *Matter of H-*, 21 I&N Dec. 337, 342–43 (BIA 1996), the Board addressed the kind of kinship ties that might constitute membership in a

particular social group. There, the Board found that the record established credible evidence that the Somali Marehan subclan constituted a "particular social group," because the subclan was "distinct and recognizable" in Somali society with distinguishing "linguistic commonalities." *Id.* at 343. The Board relied on a legal opinion by the General Counsel of the Immigration and Naturalization Service, who stated that Somali "[c]lan membership is a highly recognizable, immutable characteristic;" that Somali clans are "defined by discrete criteria"; and that "membership in a clan is at the essence of a Somali's identity in determining his or her relations to others in and outside of the clan," *Whether Somali Clan Membership May Meet the Definition of Membership in a Particular Social Group under the INA,* Genco Op. No. 93–91 (INS), 1993 WL 1504038, at *1–*2 (Dec. 9, 1993). *See H-*, 21 I&N Dec. at 342. The Board also recognized that annual reports issued by the Department of State spoke specifically to the "presence of distinct and recognizable clans and subclans in Somalia and the once-preferred position of the applicant's Marehan subclan," due to its association with former Somali President Siad Barre. *Id*. at 342–43.

Over the decades since, the Board has refined the standard for identifying social groups that qualify for protection under the asylum statute. *See M-E-V-G-*, 26 I&N Dec. at 236–49; *W-G-R-*, 26 I&N Dec. 209–21; *see also Reyes v. Lynch*, 842 F.3d 1125, 1134–35 (9th Cir. 2016) (recognizing the Board's refinement of its "particular social group" framework); *Orellana-Monson v. Holder*, 685 F.3d 511, 521 (5th Cir. 2012) ("The [Board] may make adjustments to its definition of 'particular social group' and often does so in response to the changing claims of applicants. Deference to published [Board] decisions is warranted as [the Board] gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." (internal quotation marks and citations omitted)). Specifically, in two complementary opinions issued in 2014, the Board held that an asylum applicant claiming membership in a particular social group must "establish that the group is: (1) composed of members who share a common immutable characteristic; (2) defined with particularity; and (3) socially distinct within the society in question." *M-E-V-G-*, 26 I&N Dec. at 237; *see W-G-R-*, 26 I&N Dec. at 212. The Board explained that this definition was a continuation of its earlier interpretations of "particular social group," *see, e.g.*, *Acosta*, 19 I&N Dec. 211, clarifying how the definition of "particular social group" had been refined through the process of case-by-case adjudication. *See W-G-R-*, 26 I&N Dec. at 212; *M-E-V-G-*, 26 I&N Dec. at 244–47.

In *Matter of A-B-*, Attorney General Sessions reaffirmed this approach and emphasized the importance of a rigorous application of that legal

standard. 27 I&N Dec. at 333–36.[1] Respondents must present facts to establish each of the required elements for asylum status, and the asylum officer, immigration judge, or Board must determine whether those facts satisfy the required elements. *See id*. at 340 (citing 8 C.F.R. § 208.13(a)). *Matter of A-B-* reiterated that, "[t]o be cognizable, a particular social group *must* 'exist independently' of the harm asserted." *Id*. at 334 (citing, *inter-alia*, *M-E-V-G-*, 26 I&N Dec. at 237 n.11, 243). Based upon these immigration decisions, in the ordinary case, a nuclear family will not, without more, constitute a "particular social group" because most nuclear families are not inherently socially distinct.

I recognize that a number of courts of appeals have issued opinions that recognize a family-based social group as a "particular social group" under the asylum statute. In some of these cases, the courts may have been willing (as the Board was in this case) to accept, or assume with little analysis, the existence of a particular social group because the court went on to deny asylum on other grounds. *See, e.g.*, *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019); *Rivas v. Sessions*, 899 F.3d 537, 542 (8th Cir. 2018); *Bernal-Rendon v. Gonzales*, 419 F.3d 877, 881 (8th Cir. 2005). In other cases, the parties stipulated to the validity of the applicant's particular social group definition and the applicant's membership therein. *See, e.g.*, *K.H. v. Barr*, 920 F.3d 470, 474 (6th Cir. 2019). Consequently, these cases do not reflect the thorough, case-specific analysis of the three *Matter of M-E-V-G-* factors that the Board's precedents generally require. And I do not believe that a cursory analysis of a question that was either uncontested, or not dispositive to the outcome, should be taken to undermine the Board requirement that asylum applicants claiming "membership in a particular social group" must establish that their group shares a common immutable characteristic, is defined with particularity, and is socially distinct. *See M-E-V-G-*, 26 I&N Dec. at 237–38; *see W-G-R-*, 26 I&N Dec. at 212.

I also recognize that certain courts of appeals have considered the requisite elements of a "particular social group" and, despite the requirements set forth in *M-E-V-G-* and *W-G-R-*, have nonetheless suggested that shared family ties alone are sufficient to satisfy the INA's definition of "refugee"—regardless of whether the applicant's specific family is defined with particularity or is socially distinct in his society. For instance, in *Rios v. Lynch*, the Ninth Circuit expressly observed that under the "refined

---

[1] The U.S. District Court for the District of Columbia has called into question some aspects of *Matter of A-B-* that are not relevant here. *See Grace v. Whitaker*, 344 F. Supp. 3d 96 (D.D.C. 2018). The Department of Justice has appealed that decision, which is the subject of ongoing litigation. *See* Notice of Appeal, *Grace v. Whitaker*, No. 19-5013 (D.C. Cir. Jan. 30, 2019).

framework" of *Matter of M-E-V-G-*, "the family . . . [is] the quintessential particular social group." 807 F.3d 1123, 1128 (9th Cir. 2015). In addition, three other circuits have expressed the same view, but without explicitly evaluating whether that position is consistent with *Matter of M-E-V-G-* and *Matter of W-G-R-*. *See, e.g.*, *Velasquez v. Sessions*, 866 F.3d 188, 194 (4th Cir. 2017) ("We have recognized that an individual's membership in her nuclear family is a particular social group."); *Villalta-Martinez v. Sessions*, 882 F.3d 20, 26 (1st Cir. 2018) ("[I]t is well established that the nuclear family constitutes a recognizable social group . . . ."); *Torres v. Mukasey*, 551 F.3d 616, 629 (7th Cir. 2008) ("Our prior opinions make it clear that we consider family to be a cognizable social group . . . .").

These decisions do not purport to contradict the Board's "particular social group" framework and, in my view, they have relied upon outdated dicta from the Board's early cases. For example, the First Circuit has long relied on precedent that derives from *Matter of Acosta*'s vague statement that kinship ties "might" be the kind of innate characteristic that could form the basis of a particular social group. *See, e.g.*, *Gebremichael v. INS*, 10 F.3d 28, 36 (1st Cir. 1993) (citing *Acosta* to support broad recognition of particular social groups based on the nuclear family). But the reference to "kinship ties" in *Matter of Acosta* provides no justification for a broad assumption that an applicant's nuclear family will constitute a valid particular social group in his society. The Board there did not define what it meant by "kinship ties," since the respondent had described his relevant social group instead as persons "engaged in the transportation industry" in his country. *See* 19 I&N Dec. at 232, 233.

Similarly, the Seventh Circuit has declined to apply the particularity and social distinction requirements, requiring only that members of particular social groups share a common, immutable characteristic, as recognized in *Matter of Acosta*, 19 I&N Dec. at 233. *See, e.g.*, *Melnik v. Sessions*, 891 F.3d 278, 286 n.22 (7th Cir. 2018) (noting the circuit's rejection of the Board's initial articulations of the particularity and social distinction requirements). The Seventh Circuit's refusal to reconsider its position in light of *Matter of M-E-V-G-* and *Matter of W-G-R-* has left in place circuit precedent dating from the 1990s positing, without analysis, that every family would constitute a cognizable social group under the INA. *See Torres*, 551 F.3d at 629 (citing *Iliev v. INS*, 127 F.3d 638, 642 & n.4 (7th Cir. 1997) (noting that "[o]ur case law has *suggested*, with *some* certainty, that a family constitutes a cognizable 'particular social group' within the meaning of the law," but citing only cases in which the court determined that the alien had failed to establish persecution on account of family ties (emphases added))).

Finally, the Fourth Circuit based its conclusion that nuclear families could be particular social groups on a passing suggestion by the Board that "'[s]ocial groups based on innate characteristics such as . . . family relationship are generally easily recognizable and understood by others to constitute social groups.'" *Crespin-Valladares v. Holder*, 632 F.3d 117, 126–27 (4th Cir. 2011) (quoting *Matter of C-A-*, 23 I&N Dec. 951, 959 (BIA 2006)). But *Matter of C-A-* did not concern a family-based social group, and in fact expressly cautioned against broad recognition of family-based social groups, noting that a particular social group must be recognizable as a separate, distinct group within the alien's home country. 23 I&N Dec. at 959. Therefore, the Board's passing suggestion that nuclear families always constitute "particular social group[s]" was subsequently qualified within the text of the opinion itself.

To the extent, however, that any court of appeals decision is best interpreted as adopting a categorical rule that any nuclear family could constitute a cognizable "particular social group," I believe that such a holding is inconsistent with both the asylum laws and the long-standing precedents of the Board. Since *Matter of Acosta*, the Board has emphasized that a "particular social group" must be particular and socially distinct in the society at question, which itself requires a fact-specific inquiry based on the evidence in a particular case. *Compare Acosta*, 19 I&N Dec. at 233, *and C-A-*, 23 I&N Dec. at 955, *with M-E-V-G-*, 26 I&N Dec. at 231, *and W-G-R-*, 26 I&N Dec at 210; *see also Pirir-Boc v. Holder*, 750 F.3d 1077, 1084 (9th Cir. 2014) ("To determine whether a group is a particular social group for the purposes of an asylum claim, the agency must make a case-by-case determination as to whether the group is recognized by the particular society in question."); *Miranda v. Sessions*, 892 F.3d 940, 943 (8th Cir. 2018) (applicant "did not present evidence that he shared [the defining] characteristic with others or that the characteristic was commonly recognized as defining a particular social group"). The application of contradictory rules by the courts of appeals is inappropriate because whether a specific family group constitutes a "particular social group" should be determined by the immigration courts in the first instance, as an exercise of the Attorney General's delegated authority to interpret the INA. *See Gonzales v. Thomas*, 547 U.S. 183, 185–87 (2006).

The Attorney General has primary responsibility for construing and applying provisions in the immigration laws. *See M-E-V-G-*, 26 I&N Dec. at 230. The INA provides that, within the Executive Branch, the "determination and ruling by the Attorney General with respect to all questions of law shall be controlling." 8 U.S.C. § 1103(a)(1). Plainly, the term "particular social group" is ambiguous, and every court of appeals to

address the proper application of the phrase "particular social group" has deferred to decisions of the Board in the phrase's application. *See A-B-*, 27 I&N Dec. at 327 & n.6 (collecting cases). Congress thus delegated to the Attorney General the discretion to reasonably interpret the meaning of "membership in a particular social group," and such reasonable interpretations are entitled to deference. *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984). As the Supreme Court has recognized, "'ambiguities in statutes within an agency's jurisdiction to administer are delegations of authority to the agency to fill the statutory gap in reasonable fashion. Filling these gaps . . . involves difficult policy choices that agencies are better equipped to make than courts.'" *Negusie v. Holder*, 555 U.S. 511, 523 (2009) (quoting *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005)). This principle holds even in cases where the courts of appeals might have interpreted the phrase differently in the first instance. *See Brand X Internet Servs.*, 545 U.S. at 980. I therefore interpret the ambiguous term "particular social group" in the manner that I believe to be the most faithful to the text, purpose, and policies underlying the asylum statute.

## B.

The Board has recognized that "kinship ties" may be one of the kinds of common, immutable characteristics that might form the basis for a "particular social group" under the INA. *Acosta*, 19 I&N Dec. at 233. But the Board has never held that *every* type of family grouping would be cognizable as a particular social group. *Cf. C-A-*, 23 I&N Dec. at 959 ("In considering clan membership in [a prior decision] we did not rule categorically that membership in any clan would suffice."). Here, the respondent argues that the immediate family of his father constitutes a particular social group because a local drug cartel had a dispute with his father, and the cartel chose to take that dispute out upon his family members. But the respondent did not show that anyone, other than perhaps the cartel, viewed the respondent's family to be distinct in Mexican society. If cartels or other criminals created a cognizable family social group every time they victimized someone, then the social-distinction requirement would be effectively eliminated.

Under the *ejusdem generis* canon, the term "particular social group" must be read in conjunction with the terms preceding it, which cabin its reach, *see Acosta*, 19 I&N Dec. at 233, rather than as an "omnibus catch-all" for everyone who does not qualify under one of the other grounds for asylum, *see Velasquez*, 866 F.3d at 198 (Wilkinson, J., concurring). The INA

expressly grants asylum to spouses and children of aliens who receive asylum if those family members are accompanying or following the original applicant to the United States. 8 U.S.C. § 1158(b)(3)(A). By contrast, the INA does not specify family ties alone as an independent basis for qualifying for asylum relief. *Cf. In re A-K-*, 24 I&N Dec. 275, 278 (BIA 2007) ("Automatically treating harm to a family member as being persecution to others within the family is inconsistent with the derivative asylum provisions, as it would obviate the need for these provisions in many respects.").

Further, as almost every alien is a member of a family of some kind, categorically recognizing families as particular social groups would render virtually every alien a member of a particular social group. There is no evidence that Congress intended the term "particular social group" to cast so wide a net. Moreover, 8 U.S.C. § 1101, within which the definition of "refugee" appears, uses the term family (or families) ten times in the definitions of other terms. *See, e.g.*, 8 U.S.C. § 1101(a)(15)(A), (G) (including members of "immediate famil[ies]" within eight separate classes of nonimmigrant aliens); *id.* § 1101(a)(27)(I)(iv) (referencing members of an immigrant's "immediate family" within a category of "special immigrant"); *id.* § 1101(b)(1)(E)(i) (referencing "family member[s]" within a definition of the term "child"). If Congress intended for refugee status to turn on one's suffering of persecution "on account of" family membership, Congress would have included family identity as one of the expressly enumerated covered grounds for persecution.

Thus, by the terms of the statutory definition of "refugee," as well as according to long-standing principles set forth in BIA precedent, to qualify as a "particular social group," an applicant must demonstrate that his family group meets each of the immutability, particularity, and social distinction requirements. While many family relationships will be immutable, some family-based group definitions may be too vague or amorphous to meet the particularity requirement—i.e., where an applicant cannot show discernible boundaries to the group. *See, e.g.*, *S-E-G-*, 24 I&N Dec. at 585 (noting that the "proposed group of 'family members,' which could include fathers, mothers, siblings, uncles, aunts, nieces, nephews, grandparents, cousins, and others, is . . . too amorphous a category" to satisfy the particularity requirement). Further, many family-based social groups will have trouble qualifying as "socially distinct," a requirement that contemplates that the applicant's proposed group be "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238 ("In other words, if the common immutable characteristic were known, those with the characteristic in the society in question would be meaningfully distinguished from those who do not have it."). "To have the 'social

distinction' necessary to establish a particular social group, there must be evidence showing that society in general perceives, considers, or recognizes persons sharing the particular characteristic to be a group." *W-G-R-*, 26 I&N Dec. at 217.

Asylum applicants generally seek to establish family-based groups as "particular social groups" by raising one of two principal arguments. First, many applicants assert a specific family unit as their "particular social group." *See, e.g.*, *Hernandez-Avalos v. Lynch*, 784 F.3d 944, 949–50 (4th Cir. 2015) (social group defined as appellant's nuclear family); *Rios*, 807 F.3d at 1126 (social group defined as appellant's "family"); *Perecki v. U.S. Att'y Gen.*, 446 F. App'x 236, 239 (11th Cir. 2011) (social group defined as "Perkeci family, as targets of a blood feud"). But to qualify under the statute and Board precedent, when an applicant proposes a group composed of a specific family unit, he must show that his proposed group has some greater meaning in society. It is not enough that the family be set apart in the eye of the persecutor, because it is the perception of the relevant society—rather than the perception of the alien's actual or potential persecutors—that matters. *W-G-R-*, 26 I&N Dec. at 217.

In analyzing these claims, adjudicators must be careful to focus on the particular social group *as it is defined* by the applicant and ask whether *that group* is distinct in the society in question. If an applicant claims persecution based on membership in his father's immediate family, then the adjudicator must ask whether *that* specific family is "set apart, or distinct, from other persons within the society in some significant way." *M-E-V-G-*, 26 I&N Dec. at 238. It is not sufficient to observe that the applicant's society (or societies in general) place great significance on the concept of the family. If this were the case, virtually everyone in that society would be a member of a cognizable particular social group. The fact that "nuclear families" or some other widely recognized family unit generally carry societal importance says nothing about whether a *specific* nuclear family would be "recognizable by society at large." *A-B-*, 27 I&N Dec. at 336; *see also Castellano-Chacon v. INS*, 341 F.3d 533, 548 (6th Cir. 2003) (noting that a country or society's reaction to a group is a factor in establishing whether it is a cognizable particular social group). The average family—even if it would otherwise satisfy the immutability and particularity requirements—is unlikely to be so recognized.

Second, other applicants define the relevant "particular social group" as a collection of familial relatives of persons who have certain shared characteristics. *See, e.g.*, *S.E.R.L. v. Att'y Gen. U.S.A.*, 894 F.3d 535, 541 (3d Cir. 2018) (social group defined as "immediate family members of Honduran women unable to leave a domestic relationship"); *Cordova v.*

*Holder*, 759 F.3d 332, 336 (4th Cir. 2014) (social group defined as "family members of persons who have been killed by rival gang members"); *Vumi v. Gonzales*, 502 F.3d 150, 152 (2d Cir. 2007) (social group defined as "relatives of assassination suspects"). This is a common approach in asylum cases concerning gang violence. *See, e.g.*, *Orellana-Monson v. Holder*, 685 F.3d 511, 517 (5th Cir. 2012) (social group defined to include families of Salvadoran young adults who were subjected to, and rejected, gang recruitment); *Crespin-Valladares*, 632 F.3d at 120–21 (social group defined as "consisting of family members of those who actively oppose gangs in El Salvador by agreeing to be prosecutorial witnesses"); *Poroj-Mejia v. Holder*, 397 F. App'x 234, 236 (7th Cir. 2010) (social group defined as "members of families who sought police assistance against the Mara 18"). Often, this category of family classifications fails the social distinction requirement because there is little evidence to indicate that families sharing these characteristics are seen in society as cohesive and identifiable groups. *See, e.g.*, *S-E-G-*, 24 I&N Dec. at 585–88 (holding that there was little to distinguish purported social group comprising "family members of Salvadoran youth . . . who have rejected or resisted membership in [MS-13]" from members of Salvadoran society at large, who were also threatened by gang violence). Furthermore, when proposing these kinds of groups, applicants risk impermissibly defining their purported social group in terms of the persecution it has suffered or that it fears. *See M-E-V-G-*, 26 I&N Dec. at 236 n.11 (particular social groups must exist independently of the harm asserted); *see also, e.g.*, *Poroj-Mejia*, 397 F. App'x at 237 (denying asylum claim of applicant whose proposed social group "has no existence independent of" the alleged persecutors); *Rodriguez v. U.S. Att'y Gen.*, 735 F.3d 1302, 1310 (11th Cir. 2013) (concluding that the defining attribute of applicant's proposed family member group was its persecution by the drug-trafficking organization, and the risk of persecution alone can never create a particular social group).

This opinion does not bar all family-based social groups from qualifying for asylum. To the contrary, in some societies, an applicant may present specific kinship groups or clans that, based on the evidence in the applicant's case, are particular and socially distinct. *See, e.g.*, *Ali v. Ashcroft*, 394 F.3d 780, 785 (9th Cir. 2005) (holding that the "persecution Ali suffered was clearly on account of . . . her membership in a particular social group, her clan"); *H-*, 21 I&N Dec. at 343 (recognizing a Somali subclan as a "particular social group"). But unless an immediate family carries greater societal import, it is unlikely that a proposed family-based group will be "distinct" in the way required by the INA for purposes of asylum. Moreover, adjudicators should be skeptical of social groups that appear to be "defined principally, if

not exclusively, for the purposes of [litigation] . . . without regard to the question of whether anyone in [a given country] perceives [those] group[s] to exist in any form whatsoever." *In re R-A-*, 22 I&N Dec. 906, 918 (BIA 1999; A.G. 2001), *remanded for recons. in Matter of R-A-*, 24 I&N Dec. 629 (A.G. 2008).[2]

Here, the Board's particular social group analysis merely cited past Board and federal court precedents recognizing family-based groups and then agreed with the parties' stipulations. The Board summarily concluded that "the facts of this case present a valid particular social group," without explaining how the facts supported this finding or satisfied the particularity and social visibility requirements. *L-E-A-*, 27 I&N Dec. at 42–43. This cursory treatment could not, and did not, satisfy the Board's duty to ensure that the respondent satisfied the statutory requirements to qualify for asylum. The Board's conclusion that the respondent's proposed group presents a valid "particular social group" under the INA must be reversed.

## IV.

As Attorney General Sessions previously explained, "[a]n alien may suffer threats and violence in a foreign country for any number of reasons relating to her social, economic, family, or other personal circumstances. Yet, the asylum statute does not provide redress for all misfortune." *A-B-*, 27 I&N Dec. at 318. The term "particular social group" may not receive such an elastic and unbound meaning that it includes all immediate-family units, regardless of whether the applicant's proposed family is particular and socially distinct in his society.

For the reasons stated above, I overrule the portion of *Matter of L-E-A-* discussing whether the proposed particular social group is

---

[2] Some proposed group definitions appear, on their face, to be convoluted and to lack any greater importance in society. *See, e.g.*, *Franco-Reyes v. Sessions*, 740 F. App'x 420, 421 (5th Cir. 2018) (proposed group comprising Salvadoran "nuclear fami[lies] headed by a woman with a partner who is perceived as being absent and who is perceived as having expatriated himself"); *Solomon-Membreno v. Holder*, 578 F. App'x 300, 301 (4th Cir. 2014) (proposed group comprising "young female students who are related to an individual who opposes gang practices and values"); *Rodriguez*, 735 F.3d at 1306–07 (proposed group comprising "Mexican farmers in the State of Michoacán, owning . . . farmland suitable for producing high yields of illegal drug crops (cannabis), who are subject to Drug Trafficking Organizations' (DTOs') extortion tactics on account of their ownership of said farmland and unwillingness to collaborate with the DTOs by refusing to grow and produce illegal drug crops or participate in illegal drug trafficking" (ellipses in original)); *Zavala v. Holder*, 353 F. App'x 631, 633 (2d Cir. 2009) (proposed group comprising "all persons who the Maras have targeted for revenge or recruitment as a form of repayment for that person's family's failure to support the guerrillas during the civil war").

cognizable.  27 I&N Dec. at 42–43 (Part II.A).  Furthermore, I abrogate all cases inconsistent with this opinion.

Although the Board relied on the parties' concessions to find the existence of a particular social group in this case, it ultimately concluded that the respondent failed to establish a nexus between his purported particular social group and the persecution that he alleged and feared.  I leave the Board's analysis of the nexus requirement undisturbed and remand this matter to the immigration judge for further proceedings consistent with this opinion and the remaining portions of the Board's decision below.