NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0436n.06

No. 21-3062

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

<table>
<tr><td>JESSICA ROSMERY MURILLO-OLIVA,</td><td>)</td><td></td></tr>
<tr><td>    Petitioner,</td><td>)<br>)<br>)</td><td>ON PETITION FOR REVIEW<br>OF AN ORDER OF THE<br>BOARD OF IMMIGRATION<br>APPEALS</td></tr>
<tr><td>v.</td><td>)<br>)<br>)</td><td></td></tr>
<tr><td>MERRICK B. GARLAND, Attorney General,</td><td>)<br>)</td><td></td></tr>
<tr><td>    Respondent.</td><td>)<br>)<br>)</td><td>OPINION</td></tr>
</table>

FILED
Oct 26, 2022
DEBORAH S. HUNT, Clerk

_____

Before: SUTTON, Chief Judge; BOGGS and KETHLEDGE, Circuit Judges.

BOGGS, Circuit Judge. In February 2014, two years after the gruesome killing of her cousin in Honduras, Jessica Murillo-Oliva illegally entered the United States. She applied for asylum and withholding of removal, claiming that she feared persecution as a member of a particular social group (PSG) consisting of "females from Honduras whose family members have been threatened or harmed by the gangs." An immigration judge (IJ) denied her applications, and the Board of Immigration Appeals (BIA) dismissed her appeal. The agency rejected Murillo-Oliva's proposed group under the Immigration and Nationality Act, a decision that Murillo-Oliva argues is inconsistent with two recent decisions by the Attorney General. But the agency also found that Murillo-Oliva failed to prove that she would be persecuted in Honduras *because* she was a female family member of a victim of gang violence—the nexus requirement. Substantial evidence supports this second part of the agency's decision, making a remand futile. Accordingly, we deny the petition for review.

## I. BACKGROUND

### A. Facts

Late in the summer of 2012, Luis Omar Garcia went missing. He had been living with the family of his cousin, Jessica Murillo-Oliva, who was fourteen years old at the time, in Olancho, Honduras. Before Garcia disappeared, he had taken care of a friend or colleague's house and visited frequently, only to stop visiting, which Murillo-Oliva and her family found strange. When Garcia went missing, Murillo-Oliva's family thought that he might have gone somewhere else to preach, as he had done in the past, but people in the community had not seen him.

Weeks later, the family found out through the news that Garcia was dead. According to Murillo-Oliva, "you couldn't recognize his face, blood was smeared on the walls, and his clothing was just thrown on the floor." The family reported Garcia's killing to the authorities, but Murillo-Oliva does not know whether they investigated and never found out who killed him. Soon after Garcia's death, Murillo-Oliva and her family relocated within Honduras. They did not experience any threats or harassment at their new location.

Two years later, in February 2014, Murillo-Oliva illegally entered the United States at or near Hidalgo, Texas.

### B. Agency Proceedings

On February 28, 2014, DHS served a Notice to Appear on Murillo-Oliva, charging her with inadmissibility. On September 28, 2015, at a hearing before an IJ, Murillo-Oliva conceded the charge. That same day, she applied for asylum and withholding of removal.

On October 29, 2018, Murillo-Oliva appeared before an IJ in Memphis, Tennessee, where she testified that she came to the United States because of her cousin's killing. She was afraid that

she, too, would be killed because "even if you don't have any problems with someone else, [the gangs] could do something to you." Murillo-Oliva also stated that she thought that "maybe they would either rape me and then they would kill me," because "that's what they do in Honduras," adding that "[y]ou couldn't even go out at night anymore" because there are gang members in the street.

The IJ found Murillo-Oliva to be credible, but decided that she had established neither past persecution nor a well-founded fear of future persecution. The IJ rejected Murillo-Oliva's proposed particular social group, "females from Honduras whose family members have been threatened or harmed by the gangs," as insufficiently particular on the ground that Murillo-Oliva had failed to establish which family members—hers or her cousin's—her PSG encompassed.

The IJ also found that Murillo-Oliva had failed to establish a nexus between the harm she feared and her membership in her proposed PSG. The IJ found no evidence that Garcia was killed because of his family membership, and no evidence that there was any animus against Murillo-Oliva because of her family-member circle. The IJ also concluded that Murillo-Oliva had failed to establish that she could not reasonably relocate within Honduras. Accordingly, the IJ ordered Murillo-Oliva removed.

Murillo-Oliva appealed to the BIA, which dismissed her appeal on December 23, 2020. The BIA agreed with the IJ that Murillo-Oliva's proposed PSG was insufficiently particular and not clearly defined. The BIA also affirmed the IJ's conclusion on nexus, finding that Murillo-Oliva had not identified any evidence that she would be harmed on account of her family membership or relationship to her cousin. Finally, the BIA concurred with the IJ's ruling on the possibility of internal relocation.

###### C. The Attorney General's Vacaturs

Since the BIA's decision in this case, Attorney General Garland has vacated two Trump-administration decisions that had substantially limited PSG-based asylum claims. *See Matter of L-E-A-*, 28 I. & N. Dec. 304 (AG 2021) (*L-E-A- II*); *Matter of A-B-*, 28 I. & N. Dec. 307 (AG 2021) (*A-B- III*).

The first vacatur concerned family-based PSGs. In *Matter of L-E-A-*, Attorney General Barr overruled a BIA decision that had recognized the immediate family of an applicant's father as a PSG. 27 I. & N. Dec. 581, 581 (AG 2019) (*L-E-A- I*). Despite Attorney General Barr's acknowledgment that several courts of appeals had recognized family-based social groups, *L-E-A- I* ruled that "most nuclear families are not inherently socially distinct and therefore do not qualify as 'particular social groups.'" *Id.* at 589. On June 16, 2021, Attorney General Garland directed that IJs and the BIA should no longer follow *L-E-A- I* pending an ongoing rulemaking on the definition of PSG. *L-E-A- II*, 28 I. & N. Dec. at 304.

The second vacatur dealt with PSGs based on non-governmental conduct. In *Matter of A-B-*, 27 I. & N. Dec. 316 (AG 2018) (*A-B- I*), and *Matter of A-B-*, 28 I. & N. Dec. 199 (AG 2021) (*A-B- II*), Attorney General Sessions and subsequently Acting Attorney General Rosen reviewed a BIA decision concerning a proposed PSG of "Salvadoran women who are unable to leave their domestic relationships where they have children in common with their partners." *A-B- I* overruled the BIA's earlier decision in *Matter of A-R-C-G-*, 26 I. & N. Dec. 388 (BIA 2014), which had recognized as a PSG "married women in Guatemala who are unable to leave their relationship." 27 I. & N. Dec. at 319. *A-B- I* also appeared to hold that victims of private criminal activity were presumptively ineligible for asylum. *See id.* at 317, 320. *A-B- II* reaffirmed and clarified *A-B- I*'s conclusions regarding the cognizability of private persecution that the government is "unable or

unwilling to control." *A-B- II*, 28 I & N. Dec. at 200–07. On June 16, 2021, Attorney General Garland directed that IJs and the BIA should no longer follow *A-B- I* or *A-B- II* pending forthcoming rulemaking. *A-B- III*, 28 I. & N. Dec. at 307.

## II. ANALYSIS

### A. Legal Framework

This court reviews the BIA's separate opinion as the final agency determination, but also considers the IJ's reasoning where the BIA has adopted it. *Khalili v. Holder*, 557 F.3d 429, 435 (6th Cir. 2009). We review de novo the agency's legal determinations, such as the question of whether a particular social group is cognizable under the INA. *Sanchez-Robles v. Lynch*, 808 F.3d 688, 692 (6th Cir. 2015). We review the agency's factual determinations, such as the finding of a nexus between persecution and a protected ground, under the substantial-evidence standard. *See Zometa-Orellana v. Garland*, 19 F.4th 970, 976, 977–78 (6th Cir. 2021). Under that standard, we may reverse only when the evidence "not only supports a contrary conclusion, but indeed compels it." *Mandebvu v. Holder*, 755 F.3d 417, 424 (6th Cir. 2014) (quoting *Yu v. Ashcroft*, 364 F.3d 700, 702–03 (6th Cir. 2004)).

To obtain asylum, Murillo-Oliva must prove that she is "unable or unwilling" to return to Honduras "because of persecution or a well-founded fear of persecution on account of . . . membership in a particular social group." 8 U.S.C. § 1101(a)(42)(A). To qualify for withholding, she must establish that her "life or freedom would be threatened" in Honduras "because of" her membership in a "particular social group." 8 U.S.C. § 1231(b)(3)(A); *see also* 8 C.F.R. § 1208.13(b).

Murillo-Oliva's burden of proof differs for her asylum and withholding-of-removal claims. One difference concerns the required likelihood of future persecution. For asylum, she must prove either past persecution or a well-founded fear of future persecution, which requires her to show a

"reasonable possibility" that she will suffer persecution. 8 U.S.C. § 1101(a)(42)(A); 8 C.F.R. § 1208.13(b)(2)(i)(B); *Pilica v. Ashcroft*, 388 F.3d 941, 950–51 (6th Cir. 2004). Her burden is higher for withholding: she must prove a "clear probability" of future persecution. *Al-Ghorbani v. Holder*, 585 F.3d 980, 993–94 (6th Cir. 2009) (quoting *INS v. Stevic*, 467 U.S. 407, 413 (1984)). Another distinction is that, whereas asylum applicants must show that a protected ground is "at least one central reason" for persecution, 8 U.S.C. § 1158(b)(1)(B)(i), withholding applicants need only show that a protected ground is "a reason" for persecution, § 1231(b)(3)(C); *Guzman-Vazquez v. Barr*, 959 F.3d 253, 272 (6th Cir. 2020).

But to receive either kind of relief, Murillo-Oliva must prove (1) that she is a member of a particular social group and (2) that she fears persecution because of her membership in that group. *See, e.g.*, *Bi Xia Qu v. Holder*, 618 F.3d 602, 606–08 (6th Cir. 2010) (engaging in a two-step analysis for asylum); *Al-Ghorbani*, 585 F.3d at 994 (same for withholding of removal).

In this case, the second step—nexus—is "where the rubber meets the road." *See Cece v. Holder*, 733 F.3d 662, 673 (7th Cir. 2013). The agency's determination that Murillo-Oliva failed to establish nexus is supported by substantial evidence. Accordingly, we affirm the BIA's decision and deny Murillo-Oliva's petition for review without reaching the question of whether her claimed social group is cognizable.

## B. Nexus

To satisfy the nexus requirement, Murillo-Oliva must establish that she is likely to be persecuted, at least in part, because of her membership in her claimed social group. *See Bi Xia Qu*, 618 F.3d at 608. Pointing to widespread gang violence alone is insufficient. *See Umana-Ramos v. Holder*, 724 F.3d 667, 671 (6th Cir. 2013) (citing *Gomez-Romero v. Holder*, 475 F. App'x 621, 624 (6th Cir. 2012)). Instead, Murillo-Oliva must connect the persecution that she fears to her

membership in her claimed social group. *Cruz-Guzman v. Barr*, 920 F.3d 1033, 1037 (6th Cir. 2019). We may reverse the agency's decision only if Murillo-Oliva has provided proof—direct or circumstantial—that compels the conclusion that the gangs are likely to persecute her *because* she is a female from Honduras whose family members have been threatened or harmed by the gangs. *See id.*; *INS v. Elias-Zacharias*, 502 U.S. 478, 483 (1992).

Substantial evidence supports the agency's finding on nexus. The record contains little direct or circumstantial evidence that supports Murillo-Oliva's claim that she will be targeted because of her relationship to her cousin. Murillo-Oliva does not know who killed Garcia, and neither she nor other members of her family were harmed or threatened by the gangs in the two years after Garcia's death during which they remained in Honduras. Indeed, Murillo-Oliva's testimony suggests that she fears generalized gang violence and violence against women in Honduras rather than persecution as a female family member of a victim of gang violence.

Murillo-Oliva's brief on appeal suggests that her situation represents a mixed-motive case, and that she fears persecution both because of her cousin's killing and because of her status as a woman. It is true that Murillo-Oliva need not show that she fears persecution based on her group membership alone. *See Bi Xia Qu*, 618 F.3d at 608; *Guzman-Vazquez*, 959 F.3d at 270. But Murillo-Oliva cannot dodge the nexus requirement by breaking up her proposed social group into its constituent elements, without claiming that either of those elements—her cousin's killing or her status as a woman—independently entitles her to protection under the INA. She must show that she is likely to be persecuted because she is a member of her claimed social group, the statutory ground upon which she relies for relief. *See Al-Ghorbani*, 585 F.3d at 994–98. Substantial evidence supports the agency's conclusion that she has not satisfied the nexus requirement.

**C. Futility of Remand**

Because the record does not compel the conclusion that Murillo-Oliva is likely to be persecuted because of her membership in her claimed social group, we need not remand for consideration of whether her proposed group is cognizable.

In general, when a reviewing court concludes that the agency has failed to consider a legal issue, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Mapouya v. Gonzales*, 487 F.3d 396, 405 (6th Cir. 2007) (quoting *Gonzales v. Thomas*, 547 U.S. 183, 186 (2006) (per curiam)); *see also Xin Mao Wu v. Gonzales*, 214 F. App'x 592, 595 (6th Cir. 2007) (per curiam) (citing *Orlando Ventura*, 537 U.S. 12, 16–17 (2002)). Accordingly, if a decision *on which the agency relied* has been vacated or abrogated, this change in law "counsels remand." *Zometa-Orellana*, 19 F.4th at 979 (quoting *Antonio v. Barr*, 959 F.3d 778, 790 n.3 (6th Cir. 2020)). This court has remanded other cases to the BIA following the two vacaturs that Murillo-Oliva cites in her briefs. *See id.*; *Corea v. Garland*, 860 F. App'x 397 (6th Cir. 2021); *Palma-Ulloa v. Garland*, 854 F. App'x 42 (6th Cir. 2021). In *Zometa-Orellana*, we also suggested that changes in the agency's interpretation of "particular social group" might affect the nexus analysis. 19 F.4th at 979 ("And to the extent that [the agency's] analysis regarding a particular social group changes on remand, it should then reassess the nexus requirement.").

But remand is not required where it would be futile. *Karimijanaki v. Holder*, 579 F.3d 710, 721 (6th Cir. 2009) (citing *Chen v. United States*, 471 F.3d 315, 339 (2d Cir. 2006)). More concretely, in cases where applicants had failed to establish nexus, this court and others have declined to decide whether a particular social group was cognizable and refused to remand to the agency for that purpose. *See Santana v. Lynch*, 627 F. App'x 447, 451 (6th Cir. 2015); *Kanagu v. Holder*, 781 F.3d 912, 919 (8th Cir. 2015); *Gjura v. Holder*, 502 F. App'x 91, 92 (2d Cir. 2012).

Here, though the Attorney General's vacaturs arguably affect the cognizability of Murillo-Oliva's claimed social group, they do not change the agency's nexus analysis and cannot lead to a different outcome on remand. For example, Murillo-Oliva could have argued that the BIA relied on *L-E-A- I* in dismissing Murillo-Oliva's family-based group as insufficiently particular or that the IJ relied on *A-B- I* in dismissing her fear of harm by non-governmental actors.[1] But both the BIA and the IJ analyzed nexus separately, apparently assuming, *arguendo*, that her group was cognizable. Because the agency's denial of relief rested on a ground independent of the cognizability of Murillo-Oliva's social group, a remand to the agency would be futile.

*Zometa-Orellana* is distinguishable. There, the BIA more explicitly relied on *A-B- I* by categorically excluding victims of non-governmental actors from relief. *Zometa-Orellana*, 19 F.4th at 978. Crucially, the court also found that the IJ and BIA's determination that the nexus requirement had not been met "relied on their conclusion that there was no cognizable social group." *Id.* at 978. In other cases that this court has remanded to the agency, the BIA had similarly expressly and repeatedly relied on the now-overruled decisions. *See Corea*, 860 F. App'x at 401; *Palma-Ulloa*, 854 F. App'x at 43.

No such reliance is apparent from the record in this case. Neither the IJ nor the BIA mentioned *A-B- I* or *L-E-A- I* in their decisions or suggested that claims based on family membership or harm by non-governmental actors were presumptively not cognizable. On the contrary, the IJ, whose decision *predated L-E-A- I*, expressly acknowledged that family-based groups were

---

[1] Murillo-Oliva does not make these arguments. She argues only that the vacaturs impact her eligibility for relief, not that the agency relied on the vacated decisions. The IJ, at least, could not have relied on *L-E-A- I* or *A-B- II*, which postdated its decision. While the legal addendum appended as an exhibit to the IJ's decision does refer to *A-B- I*, that addendum does not characterize that decision as changing the law.

cognizable. Unlike in *Zometa-Orellana*, there is also no indication that the agency's assessment of Murillo-Oliva's proposed group colored its nexus analysis.

### III. CONCLUSION

A remand to the agency cannot change the outcome in this case. Even if Murillo-Oliva's proposed group—"females from Honduras whose family members have been threatened or harmed by the gangs"—were cognizable under post-vacatur law, the agency's findings on nexus would still prevent her from obtaining asylum or withholding of removal.

The petition for review is **DENIED**.